Nos. 13-1960
_____

# United States Court of Appeals
### *for the*
# Fourth Circuit
_____

AMERICAN WHITEWATER; AMERICAN CANOE ASSOCIATION; GEORGIA CANOEING
ASSOCIATION; ATLANTA WHITEWATER CLUB; FOOTHILLS PADDLING CLUB; WESTERN
CAROLINA PADDLERS; JOSEPH C. STUBBS; BRUCE A HARE; KENNETH L. STRICKLAND,
*Plaintiffs-Appellants,*

*v.*

THOMAS TIDWELL, in his official capacity as Chief of the United States Forest Service; UNITED
STATES FOREST SERVICE, an agency of the United States Department of Agriculture; THOMAS J.
VILSACK, in his official capacity as Secretary of the United States Department of Agriculture; UNITED
STATES DEPARTMENT OF AGRICULTURE,
*Defendants-Appellees,*
and

ELIZABETH AGPAOA, Regional Forester Southern Region United States Forest Service; MONICA J.
SCHWALBACH, Acting Forest Supervisor Francis Marion and Sumter National Forests; MARISUE
HILLARD, Forest Supervisor National Forests in North Carolina; GEORGE M. BAIN, Forest Supervisor
Chattahoochee-Oconee National Forests,
*Defendants,*

RICHARD RUST; HENRY RUST; GOODENOW LLC; GEORGIA FORESTWATCH,
*Intervenors.*
_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA (NO. 8:09-2665-MGL)
(HONORABLE MARY G. LEWIS, JUDGE)
_____

**OPENING BRIEF OF APPELLANTS**
_____

R. Brian Hendrix                          J. Nathan Galbreath
Collin O'Connor Udell                     *Counsel of Record*
JACKSON LEWIS LLP                         Cecil H. Nelson, Jr.
10701 Parkridge Boulevard, Suite 300      NELSON GALBREATH, LLC
Reston, Virginia 20191                    25 East Court Street, Suite 201
(703) 483-8300                            Greenville, South Carolina 29601
                                          (864) 232-3766

*Attorneys for Plaintiffs-Appellants*

# TABLE OF CONTENTS

*Page*

TABLE OF CONTENTS..................................................................................*i*

TABLE OF AUTHORITIES ........................................................................ *iii*

PRELIMINARY STATEMENT ......................................................................1

JURISDICTION.............................................................................................2

STATEMENT OF ISSUES .............................................................................2

STATEMENT OF THE CASE........................................................................3

STATEMENT OF FACTS ..............................................................................4

SUMMARY OF THE ARGUMENT ............................................................12

STANDARD OF REVIEW ...........................................................................14

ARGUMENT ................................................................................................15

    A.    The District Court Erred by Holding that the USFS's 2012 Plan
           Complied with Federal Law ................................................................16

          1.    There Is Ample Evidence in the Record that Floating Is
                a Value Which Caused the Headwaters To Be Included
                in the Wild and Scenic Rivers System .....................................16

          2.    The District Court Erred by Failing To Consider Those
                Values Which Actually Caused the Chattooga River To Be
                Included in the WSR System ....................................................26

          3.    Floating Does Not "Substantially Interfere" with Public Use
                and Enjoyment of Another ORV ..............................................30

    B.    Appellees' Bans and Floating Restrictions Are Arbitrary,
           Capricious, and an Abuse of Discretion...............................................31

*i*

# TABLE OF CONTENTS

*Page*

1.   The District Court Made a Factual Error in Relying Upon the 1976 Reference to Conflicts................................................32

2.   There Exists No Clear Connection Between the Facts in the Record and the Conclusions Drawn by Appellees Regarding Recreational Conflicts...............................................33

3.   The District Failed To Invalidate Appellees' Prohibition on Tributaries Floating Which Has No Support in the Record .......................................................................................37

4.   The District Court Failed To Consider the Arbitrary and Capricious Nature of Appellees' Goal To Provide a "Boat-Free" Condition on a Wild and Scenic River.................37

5.   The Appellees' Violation of USFS Policy Constitutes Actions That Are Arbitrary, Capricious, and an Abuse of Discretion ..................................................................................39

STATEMENT IN SUPPORT OF ORAL ARGUMENT ........................................41

CONCLUSION .....................................................................................42

*ii*

# TABLE OF AUTHORITIES

*Page*

CASES

*Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*,
  462 U.S. 87 (1983) ................................................................................31

*Crutchfield v. County of Hanover*,
  325 F.3d 211 (4th Cir. 2003) ...........................................................15

*Friends of Yosemite Valley v. Kempthorne*,
  520 F.3d 1024 (9th Cir. 2008) ..................................................15, 17

*Hamilton v. Lanning*,
  130 S. Ct. 2464 (2010) .........................................................................28

*Kawaauhau v. Geiger*,
  523 U.S. 57 (1998) ................................................................................28

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife*,
  551 U.S. 644 (2007) ..............................................................................32

*Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*
  556 F.3d 177 (4th Cir. 2009) ..............................................14, 15, 36

*U.S. Dep't of Health and Human Servs. v. FLRA*,
  844 F.2d 1087 (4th Cir. 1988) .........................................................15

*W. Va. Dep't of Health and Human Resources v. Sebelius*,
  649 F.3d 217 (4th Cir. 2011) ......................................................14, 15

*Wilderness Watch, Inc. v. U.S. Fish and Wildlife Serv.*,
  629 F.3d 1024 (9th Cir. 2010) .........................................................31

RULES

Fed. R. App. P. 4(a)(1)(B) ...........................................................................2

Fourth Circuit Local Rule 34(a)...............................................................41

STATUTES

5 U.S.C. §§ 701-706....................................................................................2

# TABLE OF AUTHORITIES

*Page*

5 U.S.C. § 706(2) ..............................................................................31

5 U.S.C. § 706(2)(A) ........................................................................15

16 U.S.C. § 1271 ........................................................1, 17, 18, 26, 27, 28

16 U.S.C. § 1273 ..............................................................................28

16 U.S.C. §§ 1274(a)(1)-1287 ...........................................................5

16 U.S.C. § 1275 ..............................................................................20

16 U.S.C. § 1281 ........................................................................*passim*

16 U.S.C. § 1281(a) ................................................................16, 27, 30

28 U.S.C. § 1291 ................................................................................2

28 U.S.C. §§ 1331 ..............................................................................2

**LEGISLATIVE MATERIALS**

41 Fed. Reg. 11,852 (March 22, 1976) ...............................................8

Sen. Report No. 93-738 ...............................................................8, 25

**OTHER AUTHORITIES**

HENRY DAVID THOREAU, *The Allegash and East Branch, in* THE MAIN
  WOODS (1864), *in* 3 THE WRITINGS OF HENRY DAVID THOREAU 272
  (1906) ...........................................................................................1

USFS, *Record of Decision: Final Envtl. Impact Statement/Revised Land and
  Res. Mgmt. Plan* 13 (Jan. 2004) ........................................................9

USFS, *Chattooga River as a Wild and Scenic River* (1971) (the "1971
  Study") ................................................................................*passim*

USFS, *Decision for Appeal of the Sumter Nat'l Forest Land and Res. Mgmt.
  Plan Revision* 4 (April 28, 2005) (the "2005 Appeal Decision").......9, 10, 30, 40

# TABLE OF AUTHORITIES

*Page*

USFS, *Environmental Assessment: Managing Recreation Uses on the Upper Chattooga River* 26 (Aug. 2009) (the "2009 EA").................................................5

USFS Manual 2323.12(1), *available at* http://www.fs.fed.us/im/directives/dughtml/fsm.html ................................39, 40

## PRELIMINARY STATEMENT

As Thoreau once wrote, "Wherever there is a channel for water, there is a road for the canoe." HENRY DAVID THOREAU, *The Allegash and East Branch, in* THE MAIN WOODS (1864), *in* 3 THE WRITINGS OF HENRY DAVID THOREAU 272 (1906). This appeal arises out of Appellants' desire to enjoy hand-powered boating, or "floating,"[1] on the beautiful Headwaters of the Chattooga River. For centuries, floaters enjoyed floating on the Headwaters. However, since 1976, the Appellees have sought to drastically limit, if not entirely eliminate, floating on the Chattooga Headwaters, claiming that their efforts were intended to manage and protect the river as a valuable natural resource to be preserved for present and future use.

Congress clearly intended that floating would be permitted on the Headwaters. In 1974, under the Wild and Scenic Rivers Act (the "WRSA"), 16 U.S.C. § 1271, *et seq*., Congress designated the entire Chattooga River as a Wild and Scenic River based on a 1970 U.S. Forest Services ("USFS") Proposal and a 1971 USFS Study, which stated that floating activities were very compatible uses for the river and that floating or rafting were the best ways to see the Headwaters. Indeed, whitewater boating is a value that caused the river to be included in the federal Wild and Scenic River system to begin with.

---

[1] The terms "floating" and "boating" are used in this brief to describe such water activities as non-commercial, non-motorized methods of whitewater river floating or boating, including canoeing, kayaking, whitewater rafting, or other similar paddling activities.

1

Despite ample evidence of this Congressional intent, Appellees have tried now for almost 40 years to effectively eliminate (or ban) floating on the Headwaters – efforts which violate federal law and which are arbitrary, capricious, and an abuse of discretion.  Therefore, the District Court's decision upholding these efforts should be reversed.

## JURISDICTION

The District Court asserted jurisdiction under 28 U.S.C. §§ 1331 and 5 U.S.C. §§ 701-706.  This Court has jurisdiction pursuant to 28 U.S.C. § 1291.  The District Court issued its initial Order and Opinion on April 16, 2013.  *American Whitewater v. Tidwell*, No. 8:09-cv-02665-MGL, Docket Entry ("DE") 261 (D.S.C. April 16, 2013).  Appellants filed their Notice of Appeal on June 17, 2013. *American Whitewater v. Tidwell*, No. 8:09-cv-02665-MGL, DE 266 (D.S.C. June 17, 2013).  The District Court issued an Amended Order and Opinion on July 30, 2013.  *American Whitewater v. Tidwell*, No. 8:09-cv-02665-MGL, DE 275 (D.S.C. July 30, 2013).  The appeal is timely pursuant to Fed. R. App. P. 4(a)(1)(B).

## STATEMENT OF ISSUES

(1) Whether the District Court erred in holding that the Appellees' 2012 Plan, which bans and severely restricts floating on the Headwaters of the Chattooga River, complies with federal law?

2

(2) Whether the District Court erred in holding that Appellees' bans and floating restrictions on the Headwaters of the Chattooga River are not arbitary, capricious, and an abuse of discretion?

## STATEMENT OF THE CASE

On August 25, 2009, the Forest Supervisors for the Sumter, Chattahoochee-Oconee, and Nantahala National Forests (the "Forest Supervisors") of the United States Forest Service (USFS) signed a Decision Notice and Finding of No Significant Impact ("DN/FONSI") to amend their Land Resource Management Plans ("LRMPs") ("the 2009 Plan"). *See* JA805; [2] JA809; JA810; JA811. Appellants filed administrative appeals to the 2009 Plan, and on October 14, 2009, they filed this action challenging the 2009 Plan. *American Whitewater v. Tidwell*, No. 8:09-cv-02665-MGL, DE 1 (D.S.C. Oct. 14, 2009). On December 18, 2009, only days before the deadline to file an answer in this case, the Forest Supervisors withdrew the 2009 Plan, *see* JA816, and thus the Reviewing Officer dismissed the pending administrative appeals on that date as well. *See* JA816.

On January 31, 2011, Appellants filed an Amended Complaint, *American Whitewater v. Tidwell*, No. 8:09-cv-02665-MGL, DE 103 (D.S.C. January 31, 2011), asserting the same causes of action. Appellees issued a new plan on January 31, 2012, which resembles the withdrawn 2009 Plan. JA1395-1397;

---

[2] References in this brief to the Joint Appendix will be to JA[page number].

3

JA1424-1426; JA1452-1479.   Appellants filed a Second Amended Complaint on December 10, 2012, challenging the 2012 Plan and seeking declaratory and injunctive relief.   On January 8, 2013, the parties moved for judgment on the administrative record.  *American Whitewater v. Tidwell*, No. 8:09-cv-02665-MGL, DE 230, 231, 232, 233 (D.S.C. Jan. 8, 2013).  On April 16, 2013, the District Court issued an Order and Opinion granting the Forest Services' Motion for Judgment on the Pleadings and denying Appellants' Motion.  *American Whitewater v. Tidwell*, No. 8:09-cv-02665-MGL, DE 261 (D.S.C. April 16, 2013).   The District Court entered an Amended Order and Opinion on July 30, 2013, also granting the Forest Services' Motion for Judgment on the Pleadings and denying Appellants' Motion. *American Whitewater v. Tidwell*, No. 8:09-cv-02665-MGL, DE 275 (D.S.C. July 30, 2013).  This appeal followed.

## <u>STATEMENT OF FACTS</u>

The Chattooga River is spectacularly beautiful, "one of the longest and largest free-flowing mountain waterways in the Southeast remaining in a relatively undeveloped condition."  *American Whitewater v. Tidwell*, No. 8:09-cv-02665-MGL, DE 275 at 2 (D.S.C. July 30, 2013); JA101.  Originating in western North Carolina, it flows south to form the border of northwestern Southern Carolina and northeastern Georgia.  *See* JA882-883.  The 57-mile long river runs through the Nantahala, Chattahoochee, and Sumter National Forests ("NFs") on its way to

4

Georgia's Tugaloo Reservoir. *See* JA278. For 250 years, hand-powered boating has been practiced on the Chattooga River.[3] Only the Headwaters, which are the remote, northernmost twenty-one floatable river miles of the Chattooga above the Highway 28 bridge,[4] are at issue in this case. Many parts of the Headwaters corridor, especially in the Ellicott Rock Wilderness, are accessible only by boat due to steep cliffs.

In 1974, Congress designated the entire Chattooga River as part of the Wild and Scenic Rivers System under the Wild and Scenic Rivers Act ("WSRA"), 16 U.S.C. §§ 1274(a)(1)-1287), based on a 1971 study conducted by the USFS. *See* JA899; JA93-277 (USFS, *Chattooga River as a Wild and Scenic River* (1971) (the "1971 Study")). The 1971 Study described the Chattooga River as

> one of the few mountain rivers in the four-state area of North Carolina, South Carolina, Georgia and Tennessee without substantial commercial, agricultural or residential development along its shores . . . [A] visitor to this river is instantly transported into the midst of an unspoiled whitewater river environment. . . . The beauty of the rapids and scenery of the Chattooga drainage is unsurpassed in the Southeastern United States.

---

[3] In 2004, archeologists discovered a 250-year old, 32-foot pirogue canoe hidden in the Chattooga River banks. *See American Whitewater v. Tidwell*, No. 8:09-cv-02665-MGL, DE 16 (Kinser Aff. ¶ 13), DE 16-21 (Ex. 8 to Kinser Aff.) (D.S.C. Oct. 14, 2009).

[4] *See* JA814 (USFS, *Environmental Assessment: Managing Recreation Uses on the Upper Chattooga River* 26 (Aug. 2009) (the "2009 EA") (providing mileage for four Headwaters segments, totaling 21.8 miles)).

5

JA101 (1971 Study 5).  The 1971 Study found that Congress should include the Headwaters (and downstream sections of the Chattooga River) in the Wild and Scenic Rivers system based in large part on the Chattooga's rare and outstanding opportunities for hand-powered boating.  *See* JA233, 1971 Study 150 ("Floating activities which include rafting, canoeing, and kayaking are very compatible uses for the river because these activities can capitalize on whitewater and scenic qualities that it possesses.  By the nature of the activity, little damage, in comparison to other compatible uses, will be anticipated on the very fragile riverbanks.").

Because the river corridor in the Headwaters is so remote, the quality and diversity of the whitewater; the beauty of the rock formations, flora, fauna, and free-flowing clean water; and the sheer magnitude of the wilderness experience it offers floaters is extraordinary.  This opportunity for floaters to enjoy river adventure, scientific and nature study, bird watching, photography, fishing, and other primitive floating-related activities is both unique and precious.  Indeed, part of what makes the Chattooga so worthy of Wild and Scenic protection is the opportunity to float 57 consecutive river miles (including the Headwaters) of a remote wilderness river in the eastern United States.  Only a few opportunities to float long, continuous Class I-V whitewater in the eastern United States exist, and only the Chattooga provides such a multi-day opportunity in the Southeast.  *See*

6

*American Whitewater v. Tidwell*, No. 8:09-cv-02665-MGL, DE 16 (Kinser Aff. ¶ 10) (D.S.C. Oct. 14, 2009).

In fact, the 1971 Study explicitly recommended the Headwaters for inclusion in the Wild and Scenic River system because of its remarkable primitive floating opportunities. *See* JA168 (1971 Study 74) ("*Rafting or some method of floating is the best way to see this rugged portion of the river*. Many of the pools and canyon-enclosed sections are 10-20 feet deep and impossible to wade by hikers and fishermen.") (emphasis added). In addition, the USFS proposed to Congress a map of the Headwaters that labeled its start as the "beginning of rafting water" and noted "canoe launch sites" along the Headwaters. *See* JA241 (1971 Study 158).

In 1974, based on the 1971 Study, Congress included the Chattooga among the first rivers protected as a Wild and Scenic River. *See* JA899; JA93-277. Congress's explicit intention to protect floating on the Headwaters is memorialized in the Congressional Record:

> [On the northernmost portion of the Headwaters] access is available . . . for floaters seeking an exciting experience on this stretch of the river. [The southern portion of the Headwaters], which is crossed by only two narrow bridges, has been virtually unchanged by man. It includes some beautiful, but hazardous, whitewater . . . . In a short span of 1 ½ miles, the fast moving waters drop over 16 cascades and rapids, before reaching one of the most difficult portions of the river where, for 8 miles, it splashes around huge rocks, through narrow sluices, over numerous waterfalls and rapids, and through a Rock Gorge where house-size boulders further constrict the already narrow channel *through which floaters must pass*. While rafting this

segment is difficult, *it is about the only way to see this portion of the river* since rugged terrain makes access for hikers almost impossible.

***

Naturally, such a stream is most attractive to whitewater enthusiasts of all kinds and the river is becoming very popular in this regard. While much of it can be successfully negotiated by raft, canoe, or kayak, the shallow water and numerous rocks preclude the use of motorized boats.

JA863, JA865 (Sen. Report No. 93-738 at 3008, 3010 (1974)) (emphasis added).

Among those enthusiasts were members of Appellants, including Joe Stubbs, Ken Strickland, and Bruce Hare, who floated the Headwaters (prior to its illegal closure in 1976) in canoes, kayaks, and rafts in order to enjoy its many values both before and after the Chattooga was designated a Wild and Scenic River. *See American Whitewater v. Tidwell*, No. 8:09-cv-02665-MGL, DE 19, 20, 21 (D.S.C. Oct. 14, 2009).

Only two years after Congress designated the Chattooga as a Wild and Scenic River, Appellees began efforts that clearly contravened Congressional intent to protect floating on the Chattooga. On March 22, 1976, without benefit of any study or public input, USFS published its Chattooga Wild and Scenic Development Plan (the "1976 Plan") in the Federal Register. JA278-288. The 1976 Plan instituted a *complete prohibition* against hand-powered boating on the Headwaters. JA283 (Chattooga Wild and Scenic River – Classification, Boundaries and Development Plan, 41 Fed. Reg. 11,852 (March 22, 1976)); JA899.

8

In 1985, the USFS continued the ban in the 1985 Sumter Forest Land Resource Management Plan (the "1985 Plan"), once again without the benefit of any study or data. JA392-410 (Record of Decision (Aug. 2, 1985)).

In 2004, despite purporting to analyze the suitability of Headwaters floating, the USFS continued the complete prohibition. JA461-489 (USFS, *Record of Decision: Final Envtl. Impact Statement/Revised Land and Res. Mgmt. Plan* 13 (Jan. 2004)). In April 2004, Appellants administratively appealed the 2004 ban, and the USFS Chief agreed with Appellants in his 2005 Decision for Appeal:

> After careful review of the record . . . I am reversing the Regional Forester's 2004 Decision to continue to exclude boating on the Chattooga [Headwaters]. I find the Regional Forester does not provide an adequate basis for continuing the ban on boating above Highway 28. Because the record provided to me does not contain the evidence to continue the boating ban, his decision is not consistent with the direction in Section 10(a) of the WSRA or Sections 2(a) and 4(b) of the Wilderness Act or agency regulations implementing these Acts.

JA587 (USFS, *Decision for Appeal of the Sumter Nat'l Forest Land and Res. Mgmt. Plan Revision* 4 (April 28, 2005) (the "2005 Appeal Decision")).

In a draconian twist, the USFS appeals procedures effectively reimposed the very prohibition on boating that the USFS Chief had just reversed: the prior 1985 Plan, which also included a boating ban, was automatically substituted for the invalidated 2004 ban. However, the Chief directed the Regional Forester to conduct a "visitor use capacity analysis, *including noncommercial boat use*, and to

9

amend the plan in accordance with those results." JA587-588 (emphasis added). Ignoring the Chief's clear intent to permit floating and study it, the USFS attempted a user capacity analysis without allowing floating to occur. The Chief's order that the Regional Forester amend the invalidated plan was also ignored. Instead, the 2004 Plan was amended by the very same forest-level USFS personnel who had authored the invalidated 2004 Plan.

On August 25, 2009, the Forest Supervisors for the Sumter, Chattahoochee-Oconee, and Nantahala NFs signed a Decision Notice and Finding of No Significant Impact to amend their Land Resource Management Plans (the "2009 Plan"). JA805; JA809; JA810; JA811.

The 2009 Plan cut off all opportunities for multi-day river recreation by banning floating in the midsection of the river. Worse, the 2009 Plan prohibited all floating on the Headwaters during nine months of the year while permitting unrestricted access and use for existing non-boaters. *See* JA807-808; JA813. The 2009 Plan also prohibited boating year round on all of the Headwaters if the river is flowing below 450 cubic feet per second. This left floaters with only December, January and February – the coldest months of the year – only on certain sub-portions of the Headwaters which were cut off from the remainder of the river downstream, and only at certain water levels. *Id.* Not surprisingly, Appellants brought administrative appeals challenging the 2009 Plan and also filed this case in

10

the District Court. *American Whitewater v. Tidwell*, No. 8:09-cv-02665-MGL, DE 1 (D.S.C. Oct. 14, 2009). On December 18, 2009, just before their deadline to file an answer in this case, Appellees unilaterally withdrew the 2009 Plan. JA815 (Letter from Paul L. Bradley to Ken Arney (Dec. 18, 2009)). The Reviewing Officer dismissed the pending administrative appeals on the same date. JA816. However, with the 2009 Plan withdrawn, the pre-existing ban on boating on the Headwaters remained in force. JA900.

Over two years later, *and more than seven years after the USFS Chief held that the ban violated federal law*, the USFS issued a new plan on January 31, 2012. The 2012 Plan is similar to the withdrawn 2009 Plan, cutting off all opportunities for floating the river "north to south" by completely forbidding floating on the downstream portion of the Headwaters that adjoins the lower river. The 2012 Plan prohibits all floating on six miles of the Headwaters and partially bans floating on the remainder of the Headwaters by closing those sections for seven months of the year (leaving only December 1-April 30 available, the coldest months of the year), and closing all sections when river flows are less than 350 cubic feet per second. JA1458. In addition, Appellees created out of thin air, with zero study or analysis, a new prohibition on floating on all tributaries that flow into the Headwaters.

Accordingly, on December 10, 2012, Appellants amended their Complaint again to attach their claims to the 2012 Plan, seeking declaratory and injunctive

11

relief and requesting a remand of the 2012 Plan.  Specifically, Appellants asked the District Court to remand the 2012 Plan to the USFS with instructions to revise that plan within one year to be consistent with federal law (recognizing that floating must be "protected and enhanced," not banned).  To avoid another draconian twist, Appellants asked that floating access be no less than what is set forth in the 2012 Plan until a new revised plan becomes effective.  *American Whitewater v. Tidwell*, No. 8:09-cv-02665-MGL, DE 219 (Second Am. Compl. ¶ 196) (D.S.C. Dec. 10, 2012).  As noted, the District Court denied Appellants' Motion for Judgment on the Pleadings and granted Appellees' Motion for Judgment on the Pleadings. *American Whitewater v. Tidwell*, No. 8:09-cv-02665-MGL, DE 261 (D.S.C. April 16, 2013); *American Whitewater v. Tidwell*, No. 8:09-cv-02665-MGL, DE 275 (D.S.C. July 30, 2013).

## **SUMMARY OF THE ARGUMENT**

This Court should reverse the District Court's granting of Appellees' Motion for Judgment on the Administrative Record and remand to the District Court with instructions to issue declaratory and injunctive relief as requested by Appellants. First, the District Court erred by holding that the USFS's 2012 Plan complied with federal law.  The bans and floating restrictions instituted by Appellees violate federal law because they fail to meet the "protect and enhance" standard under the Wild and Scenic Rivers Act.  Wild and Scenic Rivers such as the Chattooga River

12

are included under the special protections of the Wild and Scenic River system because they have certain unique "values." These values set WSRs apart from other rivers and even distinguish one WSR from another. The record in this case overwhelmingly shows that floating (*e.g.*, rafting, canoeing, and kayaking) is a value that caused the Headwaters to be included in the WSR system. As such, Appellees are charged with "protecting and enhancing" floating on the Headwaters. The District Court erred by failing to look at the evidence in the administrative record and legislative history showing that floating is a value which led to the Chattooga's designation. The District Court further erred by failing to conclude that floating is therefore entitled to the "protect and enhance" standard conferred by the WSRA and failing to conclude that the USFS's 2012 plan violates that standard.

Second, the District Court erred by upholding Appellees' bans and floating restrictions on the Chattooga Headwaters, because they are arbitrary, capricious, and an abuse of discretion. As such, they violate the Administrative Procedures Act ("APA"). Appellees' contention that the bans and floating restrictions are necessary to avoid conflict between floaters and fisherman is unsupported by data and rests only on one reference from 1976 of conflicts rumored to have occurred somewhere on the Chattooga River. Thus, there exists no rational connection between the facts in the record and the conclusions drawn by Appellees as to

13

recreational conflicts. Absent such a rational connection, Appellees were not entitled to the deference accorded to them by the District Court. Appellees *chose* not to gather data about conflict, instead proceeding on an assumption that conflicts *could* occur. On this flimsy reed rests Appellees' bans and severe restrictions on floating on the Chattooga Headwaters.

Because they have failed to consider important aspects of the problem by choosing to rely on assumptions, because the conflicts they seek to avoid are not properly documented, because there is no rational connection between the facts in the record and Appellees' actions in imposing the bans and restrictions, and because they have even violated their own USFS Manual and policies in instituting the bans and restrictions, those bans and restrictions are arbitrary, capricious, an abuse of discretion, and in violation of the APA. Therefore, the District Court's decision upholding those bans and restrictions should be reversed and remanded with instructions to issue the requested declaratory and injunctive relief to Appellants.

## STANDARD OF REVIEW

This Court reviews *de novo* a district court's evaluation of agency action, as to questions of both law and fact, *W. Va. Dep't of Health and Human Resources v. Sebelius*, 649 F.3d 217, 222 (4th Cir. 2011); *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.* 556 F.3d 177, 189 (4th Cir. 2009), inasmuch as the District Court "stands

14

in no better position than an appellate court in reviewing the administrative record." *Crutchfield v. County of Hanover,* 325 F.3d 211, 217 (4th Cir. 2003). Pursuant to the APA, a reviewing court must "set aside agency action, findings, and conclusions" when they are found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also Sebelius*, 649 F.3d at 222; *Ohio Valley Envtl. Coal.*, 556 F.3d at 189. This determination rests on whether the agency "articulated a rational connection between the facts found and the choice made." *Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024, 1032 (9th Cir. 2008); *see also Ohio Valley Envtl. Coal.*, 556 F.3d at 166. Indeed, "[c]ourts must carefully review the record to ensure that agency decisions are founded on a reasoned evaluation of the relevant factors and may not rubber-stamp administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." *Kempthorne*, 521 F.3d at 1032; *see also U.S. Dep't of Health and Human Servs. v. FLRA*, 844 F.2d 1087, 1090 (4th Cir. 1988).

## ARGUMENT

This appeal is the culmination of a decades-long effort to restore the status quo that existed on the Chattooga River for centuries prior to the USFS's boating ban. It is also an effort to render federal management of the Headwaters consistent with how Appellees manage thousands of other rivers across the United States

(free from floating bans).  Because Appellees' floating ban and restrictions violate federal law and are arbitrary, capricious, and constitute an abuse of discretion, this Court should reverse the District Court's decision and remand with instructions to issue the declaratory and injunctive relief requested by Appellants.

### A. The District Court Erred by Holding that the USFS's 2012 Plan Complied with Federal Law.

The bans and floating restrictions contained in the USFS's 2012 Plan are in violation of federal law because they fail to meet the "protect and enhance" standard under the Wild and Scenic Rivers Act ("WSRA").  At the core of the WRSA is a mandate that each river in the Wild and Scenic River System must be "administered in such manner as to *protect and enhance the values which caused it to be included in said system* without, insofar as is consistent therewith, limiting other uses that do not substantially interfere with public use and enjoyment of these values."  16 U.S.C. § 1281(a) (emphasis added).  This "protect and enhance" requirement establishes the standard by which Appellees must manage the Chattooga Headwaters.

### 1. There Is Ample Evidence in the Record that Floating Is a Value Which Caused the Headwaters To Be Included in the Wild and Scenic Rivers System.

The record is clear that whitewater boating is a value which caused the Chattooga Headwaters to be included in the WSR system.  Appellees' restrictions are not based on the proper standard and contravene the statutory mandate to

16

protect and enhance whitewater boating.  In 1968, Congress enacted the WSRA so that rivers with "outstandingly remarkable scenic, recreational, geologic, fish and wildlife, historic, cultural, or other similar values [would] be preserved in a free-flowing condition, and . . . be protected for the benefit and enjoyment of present and future generations."   16 U.S.C. § 1271.   Accordingly, "[t]he WSRA framework designates rivers based on specific 'outstandingly remarkable values' ('ORVs') which both justify the initial designation of a river as a WSRS component and provide the benchmark for evaluating a proposed project affecting a designated river."  *Kempthorne*, 520 F.3d at 1027 (internal citations omitted). Under the WSRA, "protecting and enhancing the designated ORVs is paramount." *Id.*  Similarly, the WSRA guidelines of the Department of Agriculture, parent agency to the USFS, specifically require the administering agency to manage each river so as to enhance its ORVs "while providing for public recreation and resource uses that do not adversely impact or degrade those values."  *Id.* at 1028 (quoting National Wild and Scenic Rivers System:  Final Revised Guidelines for Eligibility, Classification and Management of River Areas, 47 Fed. Reg. 39,454 (Sept. 7, 1982)).

One point is worth emphasizing at the outset.  The term "ORV" is one that Appellants use in this brief as a convenience to the Court, because it is used by Appellees and the District Court, but Appellants' argument is that floating is a

*value that led to the designation* of the Chattooga River as a Wild and Scenic River as opposed to the agency's usage of the term "ORV." This "value that led to designation" point is based on 16 U.S.C. § 1281, which governs Appellees' administration of those resources it is charged with managing. The statute provides that "[e]ach component of the national wild and scenic rivers system shall be administered in such manner as to protect and enhance the *values which caused it to be included in said system* . . . ." 16 U.S.C. § 1281 (emphasis added). In other words, it is not just the broad categories of values listed in section 1271 that are determinative. Rather, pursuant to section 1281, it is also the actual values that led to designation of the river as a Wild and Scenic River in the first place.

Appellees should look at the actual record to determine those values that led to designation of the river, not simply consult a list of categories contained in a preamble – an illustrative list, rather than an exclusive list for that matter. Similarly, Appellees should not use generalities in the WSRA's preamble to override a very specific record that is replete with references demonstrating that floating was a value that led the Chattooga to be designated as a Wild and Scenic River. Under section 1281, it is a river's special characteristics that must be protected – those specific values that actually led it to be designated in the first place – in this case, floating.

18

However, the District Court held that floating is not an ORV of the Chattooga and therefore is not entitled to the "protect and enhance" status conferred by the WSRA. *American Whitewater v. Tidwell*, No. 8:09-cv-02665-MGL, DE 275 at 17 (D.S.C. July 30, 2013). But the record in this case overwhelmingly shows that floating is one of the Chattooga's ORVs because it is one of the values that caused the Headwaters to be included in the Wild and Scenic Rivers System in the first place.

The 1971 Study on which Congress relied when it included the Chattooga in the Wild and Scenic River system repeatedly recognized floating as one of the Chattooga's remarkable values warranting WSRA protection. For example, the 1971 Study provided that:

> Designating the Chattooga River a part of the National Wild and Scenic River System would preserve . . . a river with sufficient volume and flow to allow full enjoyment of river-related recreation activities. These activities like . . . *whitewater canoeing* . . . will enhance the recreation opportunities for many people in an area where river-oriented recreation is scarce; [and] a river capable of supplying many intangible values. These values are difficult to assess but *certainly exist for the canoeist* as he meets the challenge of the river . . . ."

JA160; JA161 (1971 Study 66-67). Further, the 1971 Study stated that "*floating activities which include rafting, canoeing, and kayaking are very compatible uses* for the river because these activities can capitalize on whitewater and scenic qualities that it possesses." JA273 (1971 Study 150). Specifically referring to the

19

Headwaters, the 1971 Study stated that "[r]afting or some method of floating is the best way to see this rugged portion of the river." JA168 (1971 Study 74). Indeed, the covers of each of the three 1970-1971 studies, on which Congress's decision to designate the Chattooga as a wild and scenic river were based, exclusively feature whitewater boating. *See* JA93-277; JA817; JA849; *see also American Whitewater v. Tidwell*, No. 8:09-cv-02665-MGL, DE 233-1 (D.S.C. Jan. 8, 2013) (Pls' Mem. in Supp. of Mot. for J. on the Admin. Record 13-15 (reproducing images of covers)).

In its discussion, the District Court failed to mention at least four more affirmative references to floating in the 1971 Study that were highlighted in the Second Amended Complaint and many more in other court and administrative filings in this case, and even these noted here are a small subset of the evidence in the record. In response to the mandate of the WSRA that the Secretary of Agriculture "study and submit to the President reports on the suitability or nonsuitability for addition to the national wild and scenic rivers system of rivers . . .[which] shall show . . . the characteristics which do or do not make the area a worthy addition to the system, 16 U.S.C. § 1275, the USFS produced three related documents in support of designation of the Chattooga as a Wild and Scenic river, all of which are contained in the administrative record. Those three documents were (a) a 1970 Proposal, JA817-848, (b) the 1971 Study, JA93-277,

20

and (c) a summary of the USFS report, JA849-860.  These reports contain maps, illustrations, and descriptions of characteristics that made the Chattooga worthy of Wild and Scenic designation, including maps, illustrations, and descriptions specific to floating.  These documents are the primary and irrefutable source defining the values that caused Congress to designate the Chattooga River a Wild and Scenic River and were cited in letters of support for designation authored by Appellees.

For example, the following statements clearly indicate that floating is a value that the USFS intended to protect, enhance, and actively manage, and Congress relied on such statements in designating the Chattooga River a Wild and Scenic River:

> In the entire Southeastern United States, only four rivers were designated in the National Wild and Scenic Rivers Act for study for possible inclusion in the system. . . . *The Chattooga River is the only one proposed in the Wild and Scenic Rivers Act that flows through the Southern Appalachians **and has true whitewater canoeing opportunities***.  [JA143] (emphasis added).
> ***
> Designating the Chattooga River a part of the National Wild and Scenic River System would preserve . . . a river capable of *supplying many intangible values*.  These values are difficult to assess but *certainly exist for the canoeist as he meets the challenge of the river*.  [JA161] (emphasis added).
> ***
> Only five roads cross the river in the entire length *indicating inaccessibility except by canoe or hiking*.  [JA852] (emphasis added).
> ***

21

The casual sightseer is offered only brief glimpses of the river at bridge crossings and access points.  To see and enjoy much of the river requires considerable time and effort from the recreationist, whether he be fisherman, *canoeist,* hiker or camper.  [JA855] (emphasis added).

\* \* \*

On the slower stretches, sounds other than that of water can be heard and attention is drawn away from the river course. Smooth water reflects images of plants along the bank as well as clouds, sky, and ridges.  *Slow water allows the surroundings to be seen and enjoyed, provides relaxation after the last rapids, and gives time to prepare for the next rapids*.  Near Highway 28, two long sections of slow, smooth water occur on the river and West Fork.  [JA134] (emphasis added).

\* \* \*

The canoeist and floater are showing up in increasing numbers to experience the challenge of the river.  *Sections of the river are ideal for floating in canoes and rubber rafts*.  [JA855] (emphasis added).

\* \* \*

[Interpretation] can open new vistas of knowledge and instill in the visitor a sense of appreciation for values. . . . Many visitors will have to *canoe*, hike and camp to get this association. [JA197] (emphasis added).

\* \* \*

Below Grimshaw's Bridge, *the river can be floated by raft*. [JA821] (emphasis added).

\* \* \*

Grimshaw's Bridge Crossing is at river mile 51.4, accessible by a country road.  The section below the bridge *can be floated by rubber raft and provides exciting trips over small rapids and cascades* with frequent portages around difficult cascades and narrow sluices.  [JA823] (emphasis added).

\* \* \*

[Below Bullpen Bridge], [t]his entire section (Section II) is in a near natural condition.   It includes some beautiful but hazardous whitewater.  Enormous boulders, some over 50 feet high with trees on top, rise from the riverbed.  *This part of the river can be floated only in rubber rafts* and many dangerous portions must be portaged.  In the entire 15.9 miles, only two

narrow bridges cross the river. [JA167-168; JA825] (emphasis added).

\*\*\*

The stream averages 25-30 feet in width at the beginning of this section and drops on a generally steep gradient through rugged whitewater cascades hemmed in by dense vegetation and high ridges. . . . *Two-thirds of a day are required to raft the first 2-1/2 miles of this section* because of the many portages. [JA168; JA825] (emphasis added).

\*\*\*

[Section III containing Nicholson Fields] is shallow and *easy for the inexperienced canoeist*. [JA169; JA829] (emphasis added).

\*\*\*

*Rafting or some method of floating is the best way to see this rugged portion of the river*. Many of the pools and canyon-enclosed sections are 10-20 feet deep and impossible to wade by hikers and fishermen . . . . *Two-thirds of a day is required to raft the first 2 ½ miles of this section* . . . . [JA168; JA857] (emphasis added).

\*\*\*

Measuring the Chattooga River against criteria for wild and scenic river reveals its unique qualities. It is one of the few remaining rivers in the Southeast that possess[es] free flowing white water in a primitive setting. For those eager to test this challenge, *by floating it* or walking beside it, it can provide a refreshing recreation experience. [JA856] (emphasis added).

\*\*\*

To recommend classification of this section as less than Wild River would be a failure to recognize the qualities of one of the most primitive, inaccessible, *and challenging* sections of the River. [JA827] (emphasis added).

\*\*\*

*Sites for launching canoes, kayaks, rubber rafts, and other floating equipment will be needed along the river*. In most cases launching sites on existing sand bars will be used since these bars are replenished by periodic flooding and artificial reinforcement is unnecessary [JA843] (emphasis added).

\*\*\*

23

*Eleven launching sites planned for floating equipment will be kept simple* and in general will have little development. Their location is along sandbars which will maintain themselves with periodic high water. [JA197; JA859] (emphasis added).

\*\*\*

*To enable water travelers to use the river safely, portages must be constructed* around the most dangerous whitewater areas such as falls, sluices and shoals. These portages will be designed and built to minimize wear along the river's banks and still be in keeping with the environment. [JA843] (emphasis added).

\*\*\*

*Trail systems should also include portages for canoeists* and floaters around dangerous obstacles on the river. [JA195] (emphasis added).

\*\*\*

Small information stations at each major access point can give the *detailed canoeability* and hiking information for the sections of river above and below each road point . . . [including] [m]aps showing rapids, cascades, falls and portages *with canoe class ratings* for each reach of the river [and] [c]urrent river height information related to *canoeability* of the river. [JA195; JA198; JA199] (emphasis added).

\*\*\*

*Floating activities which include rafting, canoeing, and kayaking are very compatible uses for the river because these activities can capitalize on whitewater and scenic qualities that it possesses.* By the nature of the activity, little damage, in comparison to other compatible uses will be anticipated on the very fragile riverbanks. [JA233] (emphasis added).

In sum, the District Court's assessment that the administrative record did not support a finding that whitewater floating is a value that led to designation of the Chattooga is patently wrong. *Whitewater v. Tidwell*, No. 8:09-cv-02665-MGL, DE 275 at 16 (D.S.C. July 30, 2013). The administrative record not only supports such a finding, it demands it as illustrated by the examples quoted above. The

24

designation documents recommended that Congress include the Upper Chattooga River in the Wild and Scenic River system, describing the floating values of each section of river, proposed access points, signs, and portage trails.  And Congress listened.

The Senate Report associated with passage of the legislation that added the Chattooga River to the Wild and Scenic River system confirmed that floating was a value, or ORV, that led to designation.  Indeed, particularly with respect to the Headwaters, floating was essential to the public's access to the river so they could enjoy it as Congress intended.  *See* JA863, JA865 (Sen. Report No. 93-738 at 3008, 3010 (1974)) ("While *rafting* this segment is difficult, it is about *the only way to see this portion of the river* since rugged terrain makes access for hikers almost impossible.") (emphasis added).  In that context, a ban on floating is equivalent to banning the public's access, which clearly contravenes Congress's intent in passing the WSRA.  Rather than "protect and enhance" such floating, as Appellees were required to do, Appellees have done precisely the opposite:  banning floating entirely on some Headwaters sections and instituting severe limitations on other sections.  Indeed, Appellees have even bisected the river by banning *all* floating at *all* times on its midsection (the Southernmost section of the Headwaters).  These bans and restrictions directly violate federal law, as they eviscerate the value (floating) that Appellees are required to protect.

25

2.    **The District Court Erred by Failing To Consider Those Values Which Actually Caused the Chattooga River To Be Included in the WSR System.**

In concluding that floating was not a value which caused the Chattooga River to be included in the WSR system and thus not entitled to the "protect and enhance" status conferred by the WSRA, the District Court quoted the following language from the preamble of the WSRA:

> [C]ertain selected rivers of the Nation which, with their immediate environments, possess outstandingly remarkable scenic, *recreational*, geologic, fish and wildlife, historic, cultural, or other similar *values*, shall be preserved in free-flowing condition, and that they and their immediate environments shall be protected by the benefit and enjoyment of present and future generations.

*American Whitewater v. Tidwell*, No. 8:09-cv-02665-MGL, DE 275 at 17 (D.S.C. July 30, 2013) (quoting 16 U.S.C. § 1271) (emphasis added by District Court). The District Court misapprehended the meaning of this section of the preamble and thus held that "recreation, not whitewater floating, is the protected ORV" and that whitewater floating was merely "recreation that can take place on the river." *American Whitewater v. Tidwell*, No. 8:09-cv-02665-MGL, DE 275 at 17 (D.S.C. July 30, 2013). This was error.

As discussed above, *see supra* 18, under Section 1281 ("Administration"), floating is a *value that led to the designation* of the Chattooga River as a Wild and Scenic River. 16 U.S.C. § 1281. Section 1281(a) provides under the heading of

26

"Administration:  Public use and enjoyment of components; protection of features; management plans" that "[e]ach component of the national wild and scenic rivers system shall be administered in such manner as *to protect and enhance the values which caused it to be included in said system* without, insofar as is consistent therewith, limiting other uses that do not substantially interfere with public use and enjoyment of these values.  In such administration primary emphasis shall be given to protecting its esthetic, scenic, historic, archeologic, and scientific features."  16 U.S.C. §1281(a) (emphasis added).  Importantly, without the floating ORV, none of these primary emphases of section 1281(a) such as esthetic and scientific features of the river can be directly experienced as intended by the Act since floating is the best, and often only, way to access many parts of the Headwaters.

Although Section 1271, the general preamble, contains a non-exclusive list of categories of values, it is Section 1281, not the general preamble relied upon by the District Court, which governs Appellees' *administration* of those resources it is charged with managing and charges them with the duty to "protect and enhance the *values which caused it to be included in said system* . . . ."  16 U.S.C. § 1281(a) (emphasis added).  Like all preambles, section 1271 is a broad Congressional declaration of policy that explains why the Wild and Scenic Rivers Act was enacted in the first place.  It provides that "[i]t is hereby declared to be the policy of the United States that certain selected rivers of the Nation which, with their

27

immediate environments, possess outstandingly remarkable scenic, recreational, geologic, fish and wildlife, historic, cultural, or *other similar* values, shall be preserved in free-flowing condition, and that they and their immediate environments shall be protected for the benefit and enjoyment of present and future generations." 16 U.S.C. § 1271. While reference to Section 1271 for categories of values is proper, *see id*. § 1273, Section 1271's non-exclusive list of broad categories is not meant to read Section 1281 out of the statute. *See Hamilton v. Lanning*, 130 S. Ct. 2464, 2474 (2010); *Kawaauhau v. Geiger*, 523 U.S. 57, 62 (1998) ("[W]e are hesitant to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law.") (internal quotation marks omitted). Appellees thus mistake the broad categories of values contained in Section 1271 as an exclusive list that excises those specific values that actually lead to a river's designation, in contravention of Section 1281.

Under Section 1281, Appellees necessarily must look at the *actual record* to identify those values that led to designation for the river. The practice of using a reference to the word "recreational" contained in a list of categories, treating that list as exclusive when it is clearly illustrative, and then using that list of categories to override the very detailed legislative history and administrative record rich with references demonstrating that floating was a value that led the Chattooga to be designated as a Wild and Scenic River in the first place is a practice that should not

28

be countenanced by this Court.  *See supra* 19-25.  It impermissibly reads Section 1281 out of the statute.  Certainly it deserves no deference.

Indeed, the District Court's decision supplanted values that led to designation (before 1974) with post-designation conflicting ORV determinations made in 1996 and 2012.  The 2012 Plan states that "[t]hese ORVs are largely based on information in the original WSR study report forwarded to Congress in 1971 (USFS, 1971) as well as a more recent formal analysis of the river's ORVs and conditions that the U.S. Forest Service conducted in the mid-1990s (USFS, 1996; hereafter labeled the 1996 ORV Report)."  JA914.  It is of course within Appellees' purview to flexibly manage a Wild and Scenic River to account for values recognized post-designation, but these post-designation actions cannot permissibly *eliminate*, *degrade*, or *substantially interfere* with the original values that led to designation in the first place without contravening the section 1281 of the WSRA.  Appellees agree that "[i]n many cases, ORVs are defined when the river is designated, often with direct quotations from a WSR study report."  JA914.  However, they continue that "for some rivers, including the Chattooga, rivers were designated without explicit discussion of their ORVs, so this became a post designation administrative task . . . ."  JA914.  Appellants cannot imagine more explicit discussion of floating as an ORV than the examples noted above in the administrative record and legislative history.  *See supra* 19-25.

### 3. Floating Does Not "Substantially Interfere" with Public Use and Enjoyment of Another ORV.

Under the WSRA, Appellees are permitted to limit only those river-oriented activities that "*substantially* interfere with public use and enjoyment of" a Wild and Scenic River's ORV. *See* 16 U.S.C. 1281(a) (emphasis added). This is a demanding standard, and Appellees' 2012 Plan fails to meet it.

The record contains no evidence that floating "substantially interferes" with any other ORV. In his 2005 decision, the USFS Chief highlighted this fact: "While there are multiple references in the record to resource impacts and decreasing solitude, these concerns apply to all users and do not provide the basis for excluding boaters without any limits on other users." JA586 (2005 Appeal Decision 5). In this case, the activity in question is *hand-powered* floating in remote, otherwise inaccessible areas – a *silent*, non-motorized activity. JA233 ("Floating activities which include rafting, canoeing, and kayaking are very compatible uses for the river because these activities can capitalize on whitewater and scenic qualities that it possesses."). Such floating clearly cannot rise to the level of "substantial interference."

The USFS has banned floating in contravention of federal law since 1976, so it is quite impossible that the USFS can demonstrate substantial interference when whitewater boating has been artificially removed from the resource. It is thus not surprising that since the USFS Chief declared the record deficient to support

Appellants' floating restrictions, nothing has been added to the record that substantiates the bans and severe floating restrictions contained in the 2012 Plan.

This Court should thus (1) hold that floating is a value that caused the Headwaters to be designated Wild and Scenic, that floating is therefore entitled to the "protect and enhance" status conferred by the WSRA, and that the bans and floating restrictions contained in the USFS's 2012 Plan are in violation of federal law because they fail to meet the "protect and enhance" standard under the Wild and Scenic Rivers Act ("WSRA"), and (2) reverse the District Court's decision and remand to the District Court with instructions to issue Appellants the declaratory and injunctive relief they seek.

### B. Appellees' Bans and Floating Restrictions Are Arbitrary, Capricious, and an Abuse of Discretion.

Appellees' bans and floating restrictions also violate the Administrative Procedures Act, 5 U.S.C. § 706(2), because they are arbitrary, capricious, and constitute an abuse of discretion. As noted, a court reviewing agency action under the APA's "arbitrary and capricious" standard, 5 U.S.C. § 706(2), must "determine whether the [agency] has considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983); *Wilderness Watch, Inc. v. U.S. Fish and Wildlife Serv.*, 629 F.3d 1024, 1032 (9th Cir. 2010) (holding that the Court must "carefully review the record to ensure that agency decisions are

31

founded on a reasoned evaluation of the relevant factors, and may not rubber-stamp administrative decisions that [it] deem[s] inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute."). A court should vacate an agency's decision if it has "relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view of the product of agency expertise." *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 658 (2007) (internal citations and quotation marks omitted). Appellees failed in all these particulars, and thus the District Court erred in upholding the agency decision.

### 1. The District Court Made a Factual Error in Relying Upon the 1976 Reference to Conflicts.

Appellees offer only a single reference to conflicts between fishermen and floaters. That reference is from 1976 and states that "[c]onflicts have developed on certain sections of the river where floaters and fishermen use the same waters. . . ." JA960. Although Appellees, and thus the District Court, claim that conflicts existed "as early as 1976," *American Whitewater v. Tidwell*, No. 8:09-cv-02665-MGL, DE 275 at 18-19 (D.S.C. July 30, 2013), the administrative record is devoid of any record of conflicts in the intervening years, or any other year.

32

Critically, this 1976 quote refers to conflicts rumored to have occurred somewhere on the entire Chattooga River, not specifically the 21 miles of the Headwaters at issue in this case.[5]  In fact, because paddling use was low on the Headwaters in the 1970s, and flows naturally separate uses on the Headwaters, it is extremely unlikely that the conflicts being referenced occurred on the Headwaters.

Moreover, there is no supporting evidence of actual conflicts between floaters and other visitors on the Headwaters.  There are no facts upon which to base a decision to ban floating, and even if the incident in the 1976 quote is true, there can therefore be no rational connection between it and Appellees' decision in light of the extreme unlikelihood that any such conflict occurred on the headwaters. Appellees' decision was thus arbitrary, capricious, and an abuse of discretion, and the District Court's decision upholding it was error.

> **2.    There Exists No Clear Connection Between the Facts in the Record and the Conclusions Drawn by Appellees Regarding Recreational Conflicts.**

Appellees argued below that the potential for conflicts between visitors was sufficient to justify their prohibitions and severe limits on floating.  The District Court focused on the deference due an agency, noting that an agency "mak[es]

---

[5] Appellees previously attempted to attribute the 1976 quote, which was pulled from the river-wide "Fishing" section of the Management Plan, JA877, to the Headwaters by combining it with an entirely separate quote from the "Development Plans" section, JA878, that was specific to the Headwaters. *See* JA960.

33

predictions, within its area of special expertise, at the frontiers of science."
*American Whitewater v. Tidwell*, No. 8:09-cv-02665-MGL, DE 275 at 19 & n.8
(D.S.C. July 30, 2013). That is fine as far as it is goes, but in the context of this
case, that is not very far.

First, any *de minimis* conflicts that occurred in 1976, 37 years ago, have no
relevance to recreational conditions today or in the future. Those conflicts, if
indeed they occurred, were between individuals that may not even still be alive and
would have occurred at a time of local tension over the Wild and Scenic River
designation that is largely absent today. *See* JA608-638. Times have changed, and
today we know that angling and floating can and do peacefully coexist on
mountain streams in the Southern Appalachians. *American Whitewater v. Tidwell*,
No. 8:09-cv-02665-MGL, DE 22 (Colburn Aff. at 28) (D.S.C. July 30, 2013).
Deference is one thing, but not where Appellees cannot show a rational connection
between rumored conflicts from 37 years ago and Appellees' prediction that
conflicts would occur in the future if floating were allowed. How can this be true
only on the Chattooga but not on the other hundreds of rivers and streams in the
region? This is particularly so where Appellees concede that the Headwaters are
the only Wilderness or Wild and Scenic River on which they prohibit floating to
avoid user conflicts.

34

Appellees considered over 60 "proxy rivers" that they viewed as sharing characteristics with the Upper Chattooga. JA652-653. The record contains no evidence of conflicts or direct limits related to floating on any of these proxy streams or any other regional stream. Appellees even broadened the scope of their search to look for examples of conflicts or direct limits in other regions. Appellees' consultants found that "[w]ith the exception of use limits in a few alpine areas (e.g., Mount Whitney, Mount St. Helens), *we are not aware of day use limits on WSRs*."[6] JA785 (emphasis added). Therefore, Appellees have no basis locally, regionally, or nationally to support their prediction of conflict.

Appellees did not survey visitors about their perceptions and collect actual use data. They conceded that "[n]o study has specifically assessed the intensity of conflict between boating and other uses on the upper segment of the Chattooga WSR (or other similar rivers)." JA981. The reviewing officer of the appeal of the 2004 Management Plan specifically granted the Forests the authority to allow floating for analytical purposes, *see* JA655-656. Appellants requested that Appellees allow paddling and collect rigorous data in a letter dated May 11, 2005. JA589-597. Appellees refused. The analysis period lasted seven years and Appellees collected no such evidence, forgoing the opportunity to inform their opinion with actual evidence. Instead, hardly at the "frontier of science,"

---

[6] Note these limits are not specific to floating.

*American Whitewater v. Tidwell*, No. 8:09-cv-02665-MGL, DE 275 at 19 n.8 (D.S.C. July 30, 2013), Appellees' data collection on the issue consisted of a "qualitative assessment," resting on no actual collected data such as visitor surveys but rather on a mere assumption that conflicts *could* occur because some unknown number of "low tolerance" river visitors would rather floating not occur, and therefore if floating occurred, conflicts would ensue. *See* JA981-983. This is not a "predictive model" or a "scientific determination" that deserves judicial deference. It is an assumption that has no logical foundation – especially in light of the peaceful coexistence of these groups on all other regional rivers.

Accordingly, Appellees have entirely "failed to consider an important aspect of the problem" by choosing to rely on assumptions, and inasmuch as conflicts on the Headwaters or any similar regional river are not properly documented, Appellees' explanation for its decision "runs counter to the evidence before the agency." There is no rational connection between the facts found and the choice made. *See Ohio Valley Envtl. Coal.*, 556 F.3d at 166. An agency cannot make an assumption that runs counter to the weight of evidence, decline to collect data or otherwise educate itself on the realities of the situation, and then expect judicial deference. That is precisely what the standard of "arbitrary, capricious and an abuse of discretion" was designed to prevent.

**3.    The District Failed To Invalidate Appellees' Prohibition on Tributaries Floating Which Has No Support in the Record.**

The 2012 floating bans on Headwaters tributaries were not analyzed in the Environmental Assessment or elsewhere in the record.  JA894-1394.  The 2012 decisions stated, "because of concerns regarding large woody debris, native brook trout restoration, vegetation removal, increased encounter levels, user-created trails, as well as enforcement and management issues, this alternative was considered but not developed."  JA943.  Appellees conjured their tributaries floating ban out of thin air without one shred of analysis or scientific study.  Appellees concede that they did not study why a floating ban on the Chattooga's tributaries might be warranted.  JA943.  Nevertheless, they banned floating on the tributaries anyway. The District Court upheld the floating ban despite a total absence of science and erred in so doing.

Appellees' ban on floating on tributaries is entirely unsupported, and thus is arbitrary, capricious, an abuse of discretion and violative of the APA.

**4.    The District Court Failed To Consider the Arbitrary and Capricious Nature of Appellees' Goal To Provide a "Boat-Free" Condition on a Wild and Scenic River.**

The Forest Supervisor provides in the 2012 Decision Notice that "[m]y decision will . . . [p]rotect *boat-free opportunities* . . . ."  JA1452 (2012 Decision Notice).  However, the record does not explain why "boat-free opportunities" are necessary when they do not exist on any other stream in the region.  Floating is a

37

historical, compatible, and wilderness-compliant use on the Chattooga Headwaters. Appellees arbitrarily chose to manage the Headwaters differently than they manage every other river in the country.

Appellees have instituted a total ban on floating on the lower four miles of the Headwaters.[7]  On the remaining 15 miles of the Headwaters, floaters may only descend the river during the 5 cold-weather months during rare high flow events that exceed 350 cubic feet per second and only when they launch at certain locations.  Other existing visitors suffer no such limits; they are free to enter the river all year, at all flows, and at any location.

The protection of "boat-free opportunities" is not a management goal on any other water body in the National Forest System, nor does it exist in statute or regulation.  It is a concept created by Appellees – and applied only on the Headwaters.  While some "removal conditions" do have a statutory and scientifically derived basis, such as designated Wilderness providing motorized vehicle-free conditions, there is no such basis for creating and protecting "boat-

---

[7] The District Court made a factual error, noting that the ban on commercial floating applies to 17 of the 21 miles. *Whitewater v. Tidwell*, No. 8:09-cv-02665-MGL, DE 275 at 10 (D.S.C. July 30, 2013).  In fact, commercial paddling is prohibited on the entire 21 miles.  Appellees also claimed that they allow non-commercial floating on 17 of the 21 miles of the Headwaters, but in actuality, they totally prohibit floating on the upper 1.8 miles, JA943, and lower (approximately) 4 miles, JA978, of the Headwaters.  This means that they allow severely restricted floating on roughly 15 of the 21 miles.

38

free" conditions. Absent evidence of any impact that would justify bans and severe limits aimed solely at floating, Appellees simply fabricated a desired goal of "boat-free" conditions, one that by design would be violated by the mere presence of a single hand-powered canoe. The invention of this anomalous decision criteria is arbitrary, capricious, and an abuse of discretion.

Congress never intended such an eventuality. Indeed, all the evidence, discussed at length above, *see supra* 19-25, conclusively indicates that it intended quite the opposite. Appellees' decision to displace floaters to create a "boat-free" experience is not supported by Congressional intent, has no rational connection between the facts before the agency and its decision, and thus is arbitrary, capricious, and constitutes an abuse of discretion.

### 5. The Appellees' Violation of USFS Policy Constitutes Actions That Are Arbitrary, Capricious, and an Abuse of Discretion.

Finally, the USFS Manual mandates that Appellees maximize visitor freedom within wilderness areas, minimize direct controls and restrictions, and apply direct controls only when they are essential for protection of the wilderness resource and after indirect measures have failed. USFS Manual 2323.12(1), *available at* http://www.fs.fed.us/im/directives/dughtml/fsm.html. "Indirect techniques" are techniques, such as signage, that minimize or eliminate management concerns while still allowing users to access the resource. The

Headwaters floating ban and restrictions violate USFS policy because the USFS has never applied indirect measures to floating on the Headwaters and because floating poses no threat to the wilderness resource. The USFS Manual further requires that when it becomes necessary for Appellees to limit use of a wild and scenic river, they must "ensure that all potential users have a fair and equitable chance to obtain access to the river." *Id.; see also* JA586 (2005 Appeal Decision 5).

First, as noted, the record has not substantiated the need for any limits. There is no capacity study or scientific evidence showing any need to limit floating at all. Second, even if there were a legitimate basis for limiting floating, Appellees have never attempted indirect limits on the Headwaters. Instead, they jumped straight to the harshest possible direct limits and applied them only to floaters. Appellees continue to ban all floating on the Headwaters for most of the year and to bisect the river so it is impossible for the public to enjoy the only multi-day river float in the Southeastern United States. Appellees' limits and bans are not "fair and equitable" as required by their own regulations. No other existing users are subjected to total bans, seasonal closures, water level closures, or time-of-day limits.

Appellees' own expert estimated that even without any direct limits, insufficient rainfall would prevent all floating on all sections of the Headwaters on

an average of 310 days per year. JA782. On the remaining 55 days when natural flows are likely to draw floaters, the chances of another visitor encountering a floater is extremely small due to the flow preferences, season preferences, time-of-day preferences, and geographical choices of other uses. *See, e.g.,* JA784 (Capacity & Conflict on the Upper Chattooga River, An Integrated Analysis of 2006-2007 Reports). Specifically discussing boater-hiker interactions, Appellees' expert found that "[i]n many if not most cases, encounters between hikers and boaters will be 'brief sightings' through the trees." JA783 (Capacity & Conflict on the Upper Chattooga River, An Integrated Analysis of 2006-2007 Reports). The record is deficient in showing any actual conflict or substantial interference and in fact demonstrates exactly the opposite.

Appellees' actions in instituting the bans and restrictions on floating discussed above, without any fact-based rationale, directly violate the USFS Manual and policies; constitute actions that are arbitrary, capricious, and an abuse of discretion; and, as such, violate the APA.

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Pursuant to Fourth Circuit Local Rule 34(a), Appellants respectfully request oral argument and represent that oral argument is warranted and will aid the Court's decisional process. This case involves multiple independent bases for

reversal of the decision below and an extensive record. Appellants submit that oral argument will assist the Court in addressing the issues presented.

## CONCLUSION

For all of the foregoing reasons, the Court should reverse the District Court's granting of Appellees' Motion for Judgment on the Administrative Record and remand to the District Court with instructions to issue the requested declaratory and injunctive relief.

Respectfully submitted,

*/s/ J. Nathan Galbreath*
J. Nathan Galbreath,
SC Bar #75261 (Fed. ID #10157)
*Counsel of Record*
Cecil H. Nelson, Jr.
SC Bar #4182 (Fed. ID #25211)
NELSON GALBREATH, LLC
25 East Court Street, Suite 201
Greenville, South Carolina 29601
(864) 232-3766

R. Brian Hendrix
Collin O'Connor Udell
JACKSON LEWIS LLP
10701 Parkridge Boulevard, Suite 300
Reston, Virginia 20191
(703) 483-8300

*Attorneys for Plaintiffs-Appellants*

42

**Certificate of Compliance
With Type-Volume Limitation, Typeface Requirements, and
Type Style Requirements**

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 10,114 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Professional Edition 2010 in 14 points Times New Roman font.

*/s/ J. Nathan Galbreath*
J. Nathan Galbreath

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 9, 2014, I caused this Opening Brief of Appellants to be filed electronically with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

*/s/ Cate Simpson*
Cate Simpson

4847-8814-6202